Document Number Case Number
93          06-C-0402-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
03/23/2007 05:00:52 PM CST

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

|  |  |
|---|---|
| **THE BANKRUPTCY ESTATE OF KDC, INC.** | ) **Case No. 06-C-0402-C** |
| **By its Trustee, JAMES W. MCNEILLY, JR.,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **vs.** | ) |
|  | ) |
| **HARRY KRAKLOW, et al.,** | ) |
|  | ) |
|  | ) |
| **Defendants.** | ) |

---

### Expert Report of Louis G. Dudney, CPA

## I.      Introduction

This report contains my opinions in the matter of James W. McNeilly, Trustee for the Estate of KDC, Inc. (the "Plaintiff", "KDC" or the "Company") versus Harry Kraklow, et al. (the "Defendants").  The Trustee alleges that the Defendants engaged in racketeering activity, conspiracy to defraud, breach of fiduciary duties, breach of contract, tortious interference with contractual and business relationships, trade secret theft and embezzlement and conversion (collectively, the "Inappropriate Conduct").  The Trustee further alleges that these actions injured the business of KDC.  I have been retained by counsel for certain of the Defendants, Donald Johnson ("Mr. Johnson"), Kim Myers ("Ms. Myers"), First Products, Inc. ("First Products"), Jeffrey Covelli ("Mr. Covelli"), Kenneth Banwart ("Mr. Banwart"), Darin Massner ("Mr. Massner") and Country Maid, Inc. ("Country Maid") to perform financial analyses related to alleged damages, if any, arising from the Trustee's claims.

**Confidential**                                                                **Attorney Eyes Only**

## II.      Qualifications

I am a Managing Director with AlixPartners, LLP, a financial and operational consulting firm.  My experience covers broad types of litigation, valuation, bankruptcy, and management consulting engagements, including intellectual property valuation and dispute resolution, breach of contract and lost profits analysis, fraudulent conveyance and solvency reviews, insurance dispute resolution, environmental claim analysis, and accounting malpractice and pronouncements misapplication.  More specifically, in the intellectual property area, my experience includes evaluating the economic and financial aspects of: trade secret misappropriation damages, licensing, infringement litigation, incremental profitability, reasonable royalty rates, unjust enrichment, alternative solutions pricing, intellectual property valuation and substitute technologies.

In addition, as part of working with financially and/or operationally challenged businesses, I assist companies to stabilize liquidity crises, implement management and operational changes to improve cash flow, and negotiate with creditors to restructure the balance sheet.  In addition to working on behalf of companies, I am regularly retained by creditors to provide support in analyzing credit decisions and evaluating alternative restructuring plans.

I have consulted with companies in a number of industries including, but not limited to, consumer products, computer design, specialty chemicals, real estate, financial services, entertainment, telecommunications, manufacturing, construction, and energy. In performing engagements in these industries, I have analyzed economic, accounting, and financial issues and testified in Federal, Civil, Bankruptcy and State Courts as well as American Arbitration Association hearings and state regulatory proceedings as an expert witness.

Prior to joining AlixPartners, I was a Partner in the Financial Advisory Services Group of PricewaterhouseCoopers.  I hold a Bachelor of Business Administration with a

major in accounting from The College of William & Mary and am a Certified Public Accountant. I am a member of the Illinois Society of Certified Public Accountants, the American Institute of Certified Public Accountants, the American Bankruptcy Institute, and the Licensing Executives Society.

The opinions presented in this report are based on my analysis of the available information and my experience, education, and expertise as a Certified Public Accountant and financial consultant. Exhibit 14 contains a copy of my curriculum vitae, as well as a listing of my testimony over the last four years and a listing of my publications.

As part of performing my analysis, I utilized a team of professionals who worked under my direction and control. The opinions expressed herein are subject to change based upon any additional discovery in the case or information that I may receive after the date of this report.

## III.    Background

KDC, incorporated in 1996, was a Wisconsin corporation with its principal place of business in Eau Claire, Wisconsin. After research & development had been conducted, the Company became active in May 2001 as a start-up company intending to license technology to food manufacturers in the baking industry. Accordingly, KDC's success was dependent upon its ability to develop valuable intellectual property and subsequently license those assets. In May 2001, KDC filed a provisional patent application[1] for a shelf-stable cookie dough ("SSCD") product which purportedly could be stored at ambient room temperature for extended periods of time.[2] The Company was also attempting to develop and patent frozen bread dough which could be baked in a

---

[1] A provisional patent can be established without any formal patent claims, oath or declaration, or any information disclosure. It also allows the term "Patent Pending" to be applied for a period of 12 months.
[2] United States Patent Application Publication No. US 2003/0008050 A1, dated January 9, 2003.

microwave.[3]   At approximately the time of its bankruptcy filing in 2004, KDC had two U.S. patent applications pending for Shelf Stable Sweet Goods and Frozen Mircowaveable Bakery Products.[4]

By December 2001, KDC had generated less than $1,500 in royalty income from operations and had incurred a net loss in excess of $150,000.  Despite the fact that its products had not demonstrated any commercial success, in early 2002 KDC projected that these food technologies would be valued at $43 million by the end of 2003.[5]

Throughout 2002, the Company sought additional funding and prepared business plans to send to potential investors.  These efforts were in part to raise funds for a limited liability company that KDC[6] organized in March 2002, KDC Sales and Marketing LLC ("the LLC"), which would market and sell KDC's products.[7]   KDC's principal source of funding at this time was a working capital line of credit from Citizens State Bank, which certain managers and directors of the Company guaranteed with personal assets.[8]  By the end of 2002, KDC had borrowed approximately $105,000 on this line of credit.  As of this time KDC had earned less than $2,000 in royalty income and had incurred in excess of $240,000 in net losses.  The Company was in need of additional investment capital to fund these mounting losses, and by early 2003 was able to raise approximately $200,000 primarily from the Company's management, employees and their respective family and friends.[9]   At approximately this time, KDC contacted third parties, including prominent local individuals, as potential investors, but these third parties had no interest in making

---

[3] KDC filed a provisional patent application (No. 60/376,068) and a PCT application (PCT/US03/13368) related to frozen microwaveable bakery products in April 2002 and April 2003, respectively.

[4] KDC Foods, Inc. Asset Sales Memorandum dated February 28, 2005 at page 6 (SP_0000422).

[5] Business plan for KDC Marketing LLC prepared by Richard Wanke dated March 5, 2002 (RWAE_0003766).  This document does not provide the underlying analysis to support the $43 million amount.  Accordingly, the basis for this amount and the value it is intended to represent is uncertain and unsupported.

[6] Between March 2002 and July 2003, KDC was comprised of two entities, KDC Foods, Inc. and KDC Sales & Marketing LLC (FPI_0000096).

[7] Business Plan & Prospectus for the years 2003 – 2005 at page 30 (FPI_0001095).

[8] Certificate and Assignment of Financing Documents dated as of October 22, 2004 (RWAE_0000479).

[9] KDC Foods, Inc. Plan of Merger (FPI_0000102); Affidavit of Rick Wanke at page 3; Market Value Business Valuation prepared by Jeffrey White (FPI_0000666).

an investment in the Company.[10]  Despite KDC's poor financial performance in 2002 and struggles to raise capital, the Company's management prepared financial projections in December 2002 forecasting that KDC would generate more than $2 million in royalty income and turn a profit 2003.[11]

In addition to KDC's struggles to raise capital, the Company also struggled to find customers interested in licensing its technology.  For example, in the summer of 2002, after evaluating KDC's patent application for SSCD, General Mills questioned the novelty, strength and patentability of the application.  Additionally, General Mills indicated that it would need to devote a significant amount of time and resources to test and assess the quality and stability of the KDC SSCD product.  General Mills was not willing to make such an investment.[12]

In March 2003, KDC entered into a license agreement with Country Maid that allowed Country Maid to produce and sell SSCD products developed by KDC in exchange for royalty payments based on the amount of product sold.[13]  Country Maid and a number of its employees also agreed to invest up to $300,000[14] in KDC common stock over a two-year period.  The royalty payments that were ultimately received from this contract were sporadic and did not cover KDC's operating expenses.  For example, in 2003, Country Maid paid KDC royalty payments which totaled approximately $17,000 while KDC incurred operating expenses in excess of $300,000.[15]

Also in 2003, KDC Foods, Inc. and the LLC merged (forming KDC, Inc.).[16]  After the merger, the combined entity (KDC) became responsible for both legacy

---

[10] Letter to shareholders dated April 2, 2003 (RWAE_0003365); Deposition of Stan Popko at pages 100-104 and 136-138.

[11] Business Plan & Prospectus prepared by the management of KDC Foods, Inc. at page 30 (FPI_0001095, 1107).

[12] Email from Robert S. Bramson to Annette Frawley and Mary Maurice dated August 13, 2002 (RWAE_0004053).

[13] KDC Foods, Inc. Licensing Agreement (1455 – 1467).

[14] Deposition of Stan Popko at page 139.  KDC, Inc. Capitalization table dated July 2004  (04038).

[15] Country Maid, Inc. payment record (06287) and KDC Foods, Inc. Statement of Operations for the Month and YTD Ended 9/30/03.  KDC Foods, Inc. financial data for the fourth quarter of 2003.

[16] KDC Foods, Inc. Plan of Merger.

companies' debts which totaled more than $460,000.  By the end of 2003, however, the combined KDC entities had generated royalty income of only approximately $40,000 and a cumulative net loss in excess of $500,000 since 2001.

Additionally, in 2003 Mr. Rick Wanke ("Mr. Wanke"), a former consultant to the Company, filed a lawsuit against KDC over a contract dispute which exposed the Company to a potential liability of $176,000 as well as legal costs.[17]  As a result of its poor financial results and mounting liabilities, KDC continued to be in dire need of additional investment in 2003.

In January 2004, the principals of KDC signed a business note promising to pay down the Company's note with Citizens State Bank in July 2004, on which KDC had drawn $122,000.[18]  KDC lacked the financial wherewithal to pay down the note and was unable to access additional capital.[19]  KDC ultimately filed for bankruptcy protection on December 21, 2004.[20]

In April 2005, First Products, a company formed by Mr. Johnson and other former principals of KDC, purchased KDC's assets out of bankruptcy for $250,000.[21]  I understand that these assets consisted mainly of intellectual property in the form of patent and trademark applications.

The Plaintiff's expert, Neil Beaton ("Mr. Beaton") filed a report in this matter in which he concluded that KDC had a value as of May 18, 2004 of $1.00 to $1.50 per share.  Subsequently, Mr. Beaton issued a supplemental report in which he concluded that KDC had an "aggregate, control, marketable value" ranging from $5.8 million to $8.7

---

[17] Complaint in re: Appraisal Excellence v. KDC, et al. (FPI_0002083).
[18] Business Note between KDC Foods, Inc. and Citizens State Bank dated January 14, 2004 (FPI_0001932).
[19] One of the allegations of Inappropriate Conduct in this matter is that certain of the Defendants prevented KDC from renewing the Citizens Bank Note.  While a renewal agreement with Citizens Bank would have allowed KDC to continue to only pay interest expense on the note as opposed to the principal, a renewal of the Citizens Bank Note would not necessarily have impacted KDC's operating performance and inability to generate positive cash flow.
[20] Amended Complaint at page 2.
[21] Sale Approval Order dated April 15, 2005.

million.[22]  It is the Plaintiff's position that the appropriate measure of damages is the loss of value of the business of KDC, as measured by Mr. Beaton's calculations of KDC's aggregate value less the $250,000 paid for KDC's assets in bankruptcy.[23]

### IV.     Summary of Opinions

Based on my analysis of the data and review of the documents, depositions and other materials produced in this matter, I have determined that:

A.  *KDC's financial condition was precarious in 2001 and continued to deteriorate through 2004.  The Company was unable to develop a commercially viable product, unable to generate any meaningful financial results, inadequately capitalized, suffering from severe liquidity issues, facing significant debt obligations, incurring legal costs and facing a significant contingent liability from pending litigation, and unable to raise sufficient capital to continue operations.  Given KDC's failure to successfully market its product, its deteriorated financial condition and the demonstrated failure of its technology, there can be no reasonable expectation that the Company would be able to continue operating as of mid-2004.  Therefore, even assuming liability of the Defendants, the KDC creditors and shareholders have not suffered any financial loss they would not have suffered had the alleged Inappropriate Conduct not occurred.*

B.  *First Products made a significant financial investment in the KDC intellectual property, attempted to derive financial returns on those assets and ultimately decided to abandon the KDC technology.  First Products' experience provides substantial evidence that the KDC intellectual property assets had no ultimate value and that KDC would have had no more success with its technology than did First Products.  Accordingly, the KDC creditors and shareholders have not been harmed by the alleged Inappropriate Conduct of the Defendants.*

C.  *No evidence has been provided to date that establishes any damages attributable to the Defendants related to the allegations brought by the Plaintiff in this matter.  Further, Mr. Beaton's analysis does not provide a reasonable or reliable measure of damages and his analysis is inconsistent with the facts of this case.*

These opinions are based on the information available.  Should additional information become available, I reserve the right to amend these opinions.

---

[22] Plaintiff's Supplement to FRCP Rule 26(a)(2) and 26(e).
[23] Plaintiff's Rule 26(e) Supplement to its Rule 26(a)(1)(c) Disclosure.

**V.     Analysis of Opinions**

> *A. KDC's financial condition was precarious in 2001 and continued to deteriorate through 2004. The Company was unable to develop a commercially viable product, unable to generate any meaningful financial results, inadequately capitalized, suffering from severe liquidity issues, facing significant debt obligations, incurring legal costs and facing a significant contingent liability from pending litigation, and unable to raise sufficient capital to continue operations. Given KDC's failure to successfully market its product, its deteriorated financial condition and the demonstrated failure of its technology, there can be no reasonable expectation that the Company would be able to continue operating as of mid-2004. Therefore, even assuming liability of the Defendants, the KDC creditors and shareholders have not suffered any financial loss they would not have suffered had the alleged Inappropriate Conduct not occurred.*

After the Company's incorporation in 1996, and during the period where it was actively marketing its product from May 2001 through 2004, KDC continually incurred financial losses and became increasingly burdened with debt. In addition, the Company incurred legal costs defending a lawsuit that presented a large potential financial liability. By June 2004, KDC's cash balance had fallen below $5,000 and the Company was in dire need of new capital. Unable to access sufficient new capital, the Company ultimately filed for bankruptcy protection on December 21, 2004. The factors significantly contributing to and/or evidencing KDC's collapse include the Company's:

1) Inability to produce a commercially viable product and achieve sales targets;

2) Poor financial performance;

3) Inadequate capitalization;

4) Severe liquidity issues;

5) Significant debt burden;

6) Legal costs and potential liability due to litigation;

7) Failure to raise adequate capital;  and

8) Lack of future viability.

1.  Inability to Produce a Commercially Viable Product and Achieve Sales Targets

KDC repeatedly failed to reach its financial goals.  As shown in Exhibit 1, in 2001, KDC generated only $1,353 of royalty income, which was in stark contrast to its budget target of $90,000 in royalty income.[24]  Despite KDC's 2001 results, in early 2002 KDC estimated that its intellectual property assets would generate $10 million of value by the end of 2002, and an additional $33 million by 2003.[25]  KDC's financial results do not support these significant value forecasts, however, as KDC generated only $523 in royalty income in 2002 and approximately $39,000 in 2003.  Exhibit 2 demonstrates the severe disparity between management's value expectations and KDC's actual results.

In March 2003, KDC entered into a licensing agreement with Country Maid. Country Maid's products were often used for seasonal fundraising purposes.[26]  Country Maid agreed to pay KDC a royalty of $0.16 per pound of the SSCD that it sold.[27]    As previously discussed, the royalty payments that were received in 2003 were sporadic and did not cover KDC's operating expenses.

As of September 30, 2003, more than two years after it began operating and more than seven years after its incorporation, KDC had generated less than $10,000 in royalty income, resulting in a cumulative net loss of nearly $450,000.  See Exhibit 3.  At approximately the same time, KDC management prepared a business plan for purposes of raising capital.  Once again, KDC management projected that the Company would generate a level of income that was grossly disproportionate to its historical results. While KDC had generated less than $10,000 in royalty income by the end of the third quarter of 2003, KDC management projected:

- $241,500 in royalty income and $91,383 in *net income* in Q4 2003[28]

---

[24] KDC Foods, Inc. Statement of Operations Year to Date 12/31/2001 (FPI_0002699).
[25] Business Plan for KDC Marketing LLC dated March 5, 2002 (RWAE_0003772).
[26] Deposition testimony of Donald Johnson at pages 186-187.
[27] KDC Foods Inc. Licensing Agreement with Country Maid dated March 18, 2003 (1458).
[28] KDC Foods, Inc. Prospectus & Business Plan For the Years 2003 – 2005 (3012).

- $1.4 million in royalty income and $571,000 in *net income* in 2004[29]
- $3.0 million in royalty income and $1.5 million in *net income* in 2005.[30]

Exhibits 4 and 5 demonstrate the severe disparity between these projections and KDC's historical financial performance.   Exhibit 6 further demonstrates KDC management's inability to accurately forecast, as it provides a comparison of the forecasts for the fourth quarter of 2003 made by KDC during the preceding third quarter of 2003.  KDC management's attempts to forecast only one quarter into the future was a complete failure.  For instance, KDC forecast $241,000 in royalty income for the fourth quarter of 2003 but generated only $31,058.   Management's forecasts of operating income and net income were similarly unreasonable.

During the first six months of 2004, KDC had only one significant customer[31] and generated approximately $60,000 in royalty payments and sales—again, these results were severely below management's financial goals of $1.4 million of royalty income for 2004.  In addition, its one significant customer, Country Maid, experienced quality and taste issues with KDC's products and received customer complaint calls 15 – 20 times more frequently in regard to KDC's products than for other products.  One of the issues with the KDC formula was that the cookie dough would become hard, and therefore unusable, after a period of four to five months when the product was supposed to have a shelf life of nine months.[32]  Country Maid's contract with KDC was terminated in September 2004.  Subsequently, a food scientist hired by Country Maid discovered that KDC's formula contained five to ten times the recommended usage of a preservative (arsenic) which caused the products to have an aftertaste.[33]

As discussed previously, First Products purchased the KDC intellectual property assets out of bankruptcy in 2005.  Country Maid ultimately elected not to license the KDC technology from First Products, but rather attempted to create its own shelf stable

---

[29] KDC Foods, Inc. Prospectus & Business Plan For the Years 2003 – 2005 (3013).
[30] KDC Foods, Inc. Prospectus & Business Plan For the Years 2003 – 2005 (3014).
[31] KDC Foods Income by Customer Summary.
[32] Deposition of Darin Massner at pages 65-67.
[33] Deposition of Darin Massner at pages 75-80.

cookie dough based on information that was in the public domain.[34]   Further, I understand that the patent applications filed by KDC were denied by the United States Patent and Trademark Office and that the applications were ultimately abandoned.[35]

As my analysis demonstrates, KDC suffered severe financial distress as it failed to: 1) produce a commercially viable product; 2) generate any meaningful level of revenue; and, 3) forecast its financial performance with any degree of accuracy.

       2.   Poor Financial Performance

In addition to KDC's failure to generate any meaningful amount of revenue, the Company was highly unprofitable for the entire period it operated.  In each year from 2001 through 2004, KDC generated negative earnings before interest, taxes, depreciation and amortization ("EBITDA").  As shown in Exhibit 7, on a cumulative basis, KDC lost nearly $800,000 in EBITDA during the period it operated.

In May 2004, the Company's contract with Country Maid was modified such that KDC was to receive a flat monthly payment of $19,500 per month.[36]  However, in the six months prior to May 2004, KDC had incurred average monthly expenses of approximately $40,000 per month.  In the six month period following the modification of the Country Maid agreement, KDC incurred average monthly expenses of approximately $46,000 per month.  These expenses included the cost of servicing KDC's significant debt obligations, which are discussed in more detail below.  Accordingly, to be at a break even point KDC would have needed to generate more than twice the amount of royalty income than the Country Maid agreement provided.  In addition, KDC had a license agreement with Cookies on Demand under which KDC was to receive a fixed payment of $5,000 per month.[37]  Even assuming that Cookies on Demand paid KDC $5,000 per

---

[34] Deposition of Darin Massner at pages 195-200
[35] United States Patent and Trademark Office Action Summaries.
[36] Licensed Manufacturer Agreement between Country Maid, Inc. and KDC.
[37] Licensed Manufacturer Agreement between KDC and Cookies on Demand (06058).

month, which it does not appear to have done, KDC would not have become a profitable entity.

### 3. Inadequate Capitalization

From 2001 through 2004, KDC was in constant need of additional capital and never able to raise sufficient funds. As discussed in sections 4 through 7 below, the Company's continual lack of adequate capital levels is evidenced by its ongoing liquidity issues and increasing debt obligations. In addition, KDC's significant debt burden and pending litigation greatly impaired its ability to raise adequate capital.

### 4. Severe Liquidity Issues

In addition to being highly unprofitable, KDC suffered from liquidity issues during the entire period it operated. A company's liquidity is a measure of its ability to meet short-term obligations. The current ratio, a liquidity indicator, measures the relationship between a company's current assets (such as cash, accounts receivable and inventory) and its current liabilities. A current ratio greater than 1.00 indicates a company has sufficient current assets to meet its current liabilities and conversely, a current ratio less than 1.00 conveys the opposite. As shown in Exhibit 8, KDC's current ratio was far below 1.00 during the entire time period it operated. In fact, even if KDC's largest current liability, its bank note from Citizens State Bank, is excluded from the current ratio, KDC's current ratio was still below 1.00 during the entire period it operated as shown in Exhibit 9.

Working capital is defined as a company's current assets minus its current liabilities. Accordingly, it focuses on the amount of liquid assets a company has available to operate or expand its business. Exhibit 10 illustrates that KDC had negative working capital during the entire period it operated. Again, even if KDC's largest current liability is removed from the calculation of working capital, KDC still had negative working capital during the entire period it operated as shown in Exhibit 11.

5.   Significant debt obligations

KDC had significant debt obligations at the time it became active in 2001 and throughout the entire time period it operated.  The Company's largest single source of debt financing was its note with Citizens State Bank.  KDC had $93,500 outstanding on the note by the end of 2001 which grew to $122,000 by mid-2004.  The note was guaranteed by personal assets of certain KDC management and board members.  Other sources of borrowed funds included credit card debt, notes payable from regional business funds and notes payable from Company management and employees.  In addition, KDC had accounts payable due to trade creditors.  As of April 30, 2004, KDC's total liabilities amounted to nearly $550,000.  As shown in Exhibit 12, KDC's debt greatly exceeded its available cash or other marketable securities throughout the entire period KDC operated which calls into question the Company's ability to meet these debt obligations.  For instance, in June 2004, the Company paid down a small portion of its total debt and this payment nearly depleted all of its available cash or other marketable securities.

6.   KDC's legal costs and potential liability due to litigation

Mr. Wanke worked as a consultant to KDC for a period of one year.[38]  In 2003, Mr. Wanke filed suit against KDC for allegedly not fulfilling the terms of its agreement.[39] This lawsuit caused KDC to incur legal costs in addition to its normal operating expenses to run its business.  In addition, this litigation presented a contingent liability for KDC in excess of $176,000.[40]  Mr. Wanke currently has a claim against the Bankruptcy Estate of KDC, Inc. for approximately $264,000 related to this lawsuit.[41]

---

[38] Affidavit of Rick Wanke at page 4.
[39] Affidavit of Rick Wanke at page 4.
[40] Complaint in re: Appraisal Excellence, Ltd v. KDC Foods, Inc., et al.
[41] Amended Schedule F:  Creditors Holding Unsecured Nonpriority claims.

### 7.   KDC Failed to Raise Adequate Capital

From its incorporation through early 2003, KDC's source of equity financing was primarily (if not entirely) Company management, employees and their respective family and friends.[42]   In fact, KDC contacted potential third-party investors without success.[43] In addition, KDC raised debt financing via its working capital line with Citizens State Bank and notes from Company management as well as regional business funds.

Between May and June 2004, Mr. Johnson contacted several financial institutions in an effort to raise capital without success.[44]  In July 2004, Mr. Johnson received a letter from Thomas Vanyo at Van Clemens & Co. which contained a non-binding proposal to raise $1,000,000 for KDC via a private placement transaction.[45]   However, Mr. Johnson testified that he later spoke with Mr. James Sanigular ("Mr. Sanigular") from Van Clemens and was informed that Van Clemens may be able to raise funds for KDC only if KDC resolved the dispute with Mr. Wanke and reduced its debt.[46]

In late July 2004, KDC management sent letters to selected shareholders and creditors offering shares of KDC stock at ($0.60/share).[47]   No additional investments were made by these shareholders and creditors based on this offer.   In addition, on September 7, 2004, the KDC Board of Directors sent a letter to shareholders requesting additional investment.   This letter explained that "[e]vents that have occurred since late last year have caused KDC Foods, Inc. considerable loss of income, inconvenience to customers and large expenses.  The above problems have been escalated during and after negotiations with Stan Popko, Ron Dervetski and Appraisal Excellence (Rick Wanke)."[48] No KDC shareholders invested additional funds.

---

[42] Affidavit of Rick Wanke at page 4.
[43] Letter to shareholders dated April 2, 2003 (RWAE_0003365); Deposition of Stan Popko at pages 100-104 and 136-138.
[44] Deposition of Donald Johnson at pages 233-234.  Affidavit of Donald Johnson.
[45] Letter to Kreative Dough Concepts dated July 21, 2004 (06310).
[46] Deposition testimony of Donald Johnson at page 203-204.
[47] Letters to shareholders from Kim Myers (1081 – 1089).
[48] Letter to Shareholders from KDC Board of Directors dated September 7, 2004. (1090).

While KDC was able to raise approximately $120,000 in equity financing in 2004 from Country Maid and other investors, this amount was not enough to fund the losses the Company had incurred.  As shown in Exhibit 13, by the end of 2004, KDC had incurred a net loss of nearly $800,000, which exceeded its sources of debt and equity financing.

8.   KDC's lack of future viability

As my analysis demonstrates, the Company was in severe financial distress as of mid-2004.  KDC was unprofitable, suffering from severe liquidity issues, significantly burdened with debt, facing a large contingent liability and legal costs in connection with litigation and unable to access sufficient capital.  Given these circumstances, it is unreasonable to assume that KDC could continue operating without a significant infusion of additional capital or a significant restructuring of its debt.

B. *First Products made a significant financial investment in the KDC intellectual property, attempted to derive financial returns on those assets and ultimately decided to abandon the KDC technology. First Products' experience provides substantial evidence that the KDC intellectual property assets had no ultimate value and that KDC would have had no more success with its technology than did First Products. Accordingly, the KDC creditors and shareholders have not been harmed by the alleged Inappropriate Conduct of the Defendants.*

KDC's value was premised on the value of its intellectual property. In order to assess the realized value, if any, of KDC's intellectual property assets, I analyzed the financial performance of First Products subsequent to its purchase of these assets out of bankruptcy in April 2005. Based on my analysis of First Products' experience from early 2005 to date, I have determined that the KDC intellectual property assets ultimately were demonstrated to have little to no value.

Based on my review of documentation produced in this matter and interviews with the principals of First Products, it is my understanding that:

- First Products purchased the KDC assets at auction out of bankruptcy for $250,000 in April 2005.[49]

- The United States Patent & Trademark Office rejected KDC's SSCD patent applications as obvious based on the existence of prior art.[50]

- Country Maid ultimately elected not to pursue a license agreement with First Products, but rather, to create its own SSCD product based on information that was available in the public domain.

---

[49] Second Amended and Restated Asset Purchase Agreement at page 3.
[50] United States Patent and Trademark Office Action Summaries.

**Confidential**                      16                      **Attorney Eyes Only**

- First Products created a Private Placement Memorandum dated April 30, 2005 in an effort to sell 1,000,000 to 1,500,000 shares of common stock at $1.50 per share.  Van Clemens & Co. was hired to handle the offering. [51]

- This offering was to support a business plan based on the KDC intellectual property assets purchased by First Products.

- Van Clemens was terminated as the Agent on the offering on June 30, 2005.[52] Subsequently, Van Clemens sent a letter to the NASD indicating that it was unable to secure sufficient interest from subscribers to invest in the offering.[53]

- On July 8, 2005 First Products issued a Supplement to its Private Placement Memorandum which reduced the minimum number of shares from 1,000,000 to 280,000.[54]

- In August 2005, Harry Kraklow, ("Mr. Kraklow") and Cynthia Kandler ("Ms. Kandler"), the individuals responsible for product development for both KDC and First Products, resigned from First Products.[55]

- From April 30, 2005, when First Products initiated its equity offering, until the date of Mr. Kraklow's and Ms. Kandler's resignations, First Products was able to raise more than $700,000 in equity capital from investors.[56]  Despite the fact that First Products raised this capital, it was still unable to create a viable product using the KDC technology.

- In 2005, First Products attempted to develop a SSCD product for Pinnacle Foods to be sold in Sam's Clubs as a test market.  This product, which was

---

[51] First Products Confidential Private Placement Memorandum dated April 30, 2005 (VC096).
[52] Termination of Agency Agreement (FPI_0006554).
[53] Letter to NASD from Van Clemens, & Co. dated April 24, 2006 (VC010 – 11).
[54] Supplement to Confidential Private Placement Memorandum dated April 30, 2005 (FPI_0006536).
[55] Affidavit of Harry Kraklow and interview with Mr. Johnson and Mr. Covelli.
[56] First Products, Inc. Transactions by Account (FPI_0006574).

based on the KDC formulation, had issues with "oiling" and "gassing" and did not meet the standards of quality required by Pinnacle Foods.[57]

- In September 2005, Mr. Johnson contacted a consultant, Randal Baker, to potentially assist First Products with the development of a new SSCD product.[58]

- In October 2005, Mr. Baker took the First Products SSCD, which was based on the KDC formula, to a food science firm named Merlin Development. Merlin evaluated the dough and found issues with the product including:
    o Visible oil;
    o Unappealing taste;
    o Acid/salt imbalance;
    o Prevalence of a bitter taste.[59]

- Also in October 2005, Mr. Baker, on behalf of First Products, requested that Merlin Development create a high-quality shelf stable cookie dough.[60]

- In November 2005, Merlin Development advised Mr. Baker that the KDC patent application was indefensible and that in all likelihood Merlin would develop an improved formulation that used different ingredients.[61]

- Also in November 2005, Mr. Baker, on behalf of First Products, instructed Merlin Development to "develop a great shelf stable [chocolate chip] cookie…from a blank sheet of paper."[62]

---

[57] Deposition of Donald Johnson (Day 2) at pages 48-49. Email from Randal Baker to Linda Paulson dated October 18, 2005 (FPI_0006564).
[58] Email from Mr. Johnson to Randal Baker dated September 8, 2005 (FPI_0006579).
[59] Email form Linda Paulson to Randal Baker dated 10/2/2005 (FPI_0006557).
[60] Email from Randall Baker to Linda Paulson dated 10/18/2005 (FPI_0006559).
[61] Email from Linda Paulson to Randal Baker dated 11/1/2005 (FPI_0006531).
[62] Email from Randal Baker to Mr. Johnson dated November 2, 2005 (FPI_0006578).

- By December 2005, Merlin Development had created a new SSCD product for First Products and resolved the issues present in the formulation based on the KDC technology. This product was well received by Pinnacle Foods.[63]

- Between September 30, 2005 and early 2006, as First Products developed its own formulation for SSCD with Merlin Development, it raised an additional $1.3 million in capital through sales of its common stock.[64]

- First Products abandoned the pursuit of the KDC patents and wrote off the value of the KDC patents in December 2005.[65]

Based on my analysis of First Products' financial investment in the KDC product, its ultimate abandonment of the KDC technology demonstrates that the KDC technology had little to no realizable value. Moreover, had KDC been able to raise additional capital, it is unreasonable to assume that KDC would have had any greater success with its technology than did First Products. As such, there is no evidence to support the assertion that the creditors and shareholders of KDC have been harmed by the alleged Inappropriate Conduct of the Defendants.

> C. *No evidence has been provided to date that establishes any damages attributable to the Defendants related to the allegations brought by the Plaintiff in this matter. Further, Mr. Beaton's analysis does not provide a reasonable or reliable measure of damages and his analysis is inconsistent with the facts of this case.*

The Plaintiff has not provided an appropriate analysis of damages in this matter. The Plaintiff appears to contend that the Defendants, through the alleged Inappropriate Conduct, caused a diminution in the value of KDC from a purported May 2004 value of $5.8 million to $8.7 million, down to $250,000, the amount received in the KDC asset

---

[63] Email correspondence between Randal Baker and Pinnacle Foods dated December 2005 (FPI_0006533 – 6535; FPI_0006570).
[64] First Products Balance Sheets dated September 30, 2005 and January 31, 2006.
[65] First Products, Inc. Profit & Loss, December 2005 (FPI_0006475-76).

sale out of bankruptcy.  As such, the damages claimed by the Plaintiff appear to relate to some estimate of the purported diminution in the total value of the Company.  The $5.8 million to $8.7 million estimate of the value of KDC that the Plaintiff relies on in calculating this purported diminution in value is based on the flawed analysis of Mr. Beaton.

Damages are intended to compensate the plaintiff such that the plaintiff is placed in the financial position it would have been in, but for the alleged acts of the defendants. Plaintiff's implied damages theory in this matter would not accomplish this goal; rather, it would result in placing the Plaintiff in a much better financial position than it ever experienced or could have reasonably expected to enjoy.  This financial windfall for the Plaintiff results from the significant flaws in the Plaintiff's and Mr. Beaton's analyses. *First*, Plaintiff's damages analysis is based in large part on Mr. Beaton's flawed valuation analysis, and therefore, like Mr. Beaton, the Plaintiff fails to acknowledge that the value of KDC is concentrated in its intellectual property assets and substantial evidence exists that this intellectual property had little to no value.  *Second*, the Plaintiff's and Mr. Beaton's analyses overlook KDC's severely deteriorated financial condition.  *Third*, the damages analysis does not provide any causal link between the alleged actions of the Defendants and the diminution based damages calculated.  *Fourth*, the Plaintiff's theory ignores the fact that the Bankruptcy Court approved the sale of the KDC assets to First Products for $250,000 after having been satisfied that best efforts had been exercised to maximize the value of these assets.[66]

In calculating the value of KDC for damages purposes, the Plaintiff and Mr. Beaton have ignored the importance of the ultimate failure of the KDC technology.  This failure is evidenced by KDC and First Products' significant investment in the technology and their ultimate inability to create a commercially viable product.  Neither KDC nor First Products were able to create any significant value from the KDC technology at issue.  In light of the failure of KDC's technology, if damages are awarded based on

---

[66] Sale Approval Order dated April 15, 2005.

Beaton's calculation, as the Plaintiff appears to be claiming, it would essentially provide a windfall for the KDC creditors and shareholders. This windfall results because the Plaintiffs owned the KDC technology which had little or no value and they were in no worse position after the alleged Inappropriate Conduct, as the technology has never proved to have any value.

The Plaintiff utilizes Mr. Beaton's estimated value in calculating the purported diminution of value of the Company. Mr. Beaton's valuation is significantly flawed, however, as he appears to have performed his analysis in a vacuum by failing to provide any significant discussion or analysis regarding the ultimate failure of KDC's technology or the Company's financial condition or performance as of his May 18, 2004 valuation date. Mr. Beaton also fails to discuss the causes of KDC's financial demise. His analysis leaves the false impression that KDC was a viable business as of May 18, 2004, disregarding the fact that the Company was in severe financial distress as of this date.

The Plaintiff's approach implies that damages result from the diminution of value caused by the alleged Inappropriate Conduct of the Defendants. Neither Mr. Beaton nor the Plaintiff has provided any analysis which supports such a causal link between the alleged Inappropriate Conduct of the Defendants and any purported diminution in value of KDC. No analysis evidencing that the alleged Inappropriate Conduct was a substantial factor, or a factor at all, in the purported diminution in value has been provided. Mr. Beaton and the Plaintiff have, however, disregarded the obvious reasons for the failure of KDC, including, but not limited to: its unviable intellectual property, poor financial performance, inadequate capital, and inability to raise required funding. Further, Mr. Beaton performed a discounted cash flow analysis to corroborate his initial findings. This analysis is based on the unreasonable projections prepared by KDC and is not grounded in reality - that KDC was in severe financial distress with little or no ability to continue operating as a going concern.

Furthermore, Mr. Beaton also disregards that the bankruptcy court, a fiduciary body, approved the sale of KDC's intellectual property assets for $250,000. Accordingly, the

valuation provided by Mr. Beaton does not provide a meaningful metric for use in the calculation of damages.

In addition to the theoretical flaws of Mr. Beaton's analysis, his actual calculation contains the following weaknesses and questionable assumptions:

- Mr. Beaton's calculation is based on stock transactions between related parties which do not reflect an informed shareholder opinion based on thorough due diligence. Mr. Massner testified that the Board of Directors of Country Maid did a poor job of due diligence. Specifically, they did not do an evaluation of KDC's intellectual property or seek legal review of the license contracts.[67] According to Mr. Massner, Country Maid viewed the investment in KDC as a "goodwill gesture to tie the knot."[68]

- Mr. Beaton's calculation ignores transactions which fail to support his conclusion that the value of KDC was $1.00 to $1.50 per share. For example, he ignores the 1,000,000 shares purchased by Mr. Johnson, Ms. Myers and Cynthia Kandler for $0.01 in July 2004.

- Mr. Beaton's report also ignores previous analyses which fail to support his value conclusion. For example, in March 2003 Jeffrey White ("Mr. White"), a valuation consultant based in Eau Claire, Wisconsin, determined that KDC Sales & Marketing LLC had no value.[69]

- Mr. Beaton's report contains contradictory statements as to the value of Mr. Popko's shares. Despite Mr. Beaton's opinion that KDC's stock was worth $1.00 to $1.50 per share in May 2004, Mr. Beaton implies that it was

---

[67] Deposition of Darin Massner at pages 34-36.
[68] Deposition of Darin Massner at pages 32.
[69] Valuation Consultant's Report by Jeffrey White dated March 1, 2003 (FPI_0000654).

inappropriate for Mr. Popko to be issued an IRS Form 1099 which values his share at $1.00 per share.

- While Mr. Beaton ignores the transaction price, he includes the nearly 1,000,000 shares of stock purchased by Mr. Johnson, Ms. Myers and Ms. Kandler for $0.01 in 2004 and re-values these shares at $1.00 per share.  Mr. Beaton provides no explanation for this in his report.

- Mr. Beaton's damages calculation is based on a $1.00 to $1.50 per share value which is not representative of the value the majority of investors in the Company paid.  For instance, evidence indicates that no investor ever paid more than $1.00 per share.

As demonstrated by the facts in this case, KDC cannot reasonably demonstrate that its creditors and shareholders are currently harmed as a result of the alleged Inappropriate Conduct.  Mr. Beaton's analysis ignores the ultimate failure of KDC's intellectual property and the Company's distressed financial condition, and fails to provide a causal link between the alleged Inappropriate Conduct of the Defendants and the bankruptcy of KDC.  As such, his analysis and the Plaintiff's analysis relying thereon, does not provide a reasonable measure of damages, if any, in this matter.

## VI.     Conclusions

Based on my analysis of the data and review of the documents produced in this matter, I have determined that:

A.   *KDC's financial condition was precarious in 2001 and continued to deteriorate through 2004.   The Company was unable to develop a commercially viable product, unable to generate any meaningful financial results, inadequately capitalized, suffering from severe liquidity issues, facing significant debt obligations, incurring legal costs and facing a significant contingent liability from pending litigation, and unable to raise sufficient capital to continue operations.   Given KDC's failure to successfully market its product, its deteriorated financial condition and the demonstrated failure of its technology, there can be no reasonable expectation that the Company would be able to continue operating as of mid-2004.   Therefore, even assuming liability of the Defendants, the KDC creditors and shareholders have not suffered any financial loss they would not have suffered had the alleged Inappropriate Conduct not occurred.*

B.   *First Products made a significant financial investment in the KDC intellectual property, attempted to derive financial returns on those assets and ultimately decided to abandon the KDC technology.   First Products' experience provides substantial evidence that the KDC intellectual property assets had no ultimate value and that KDC would have had no more success with its technology than did First Products.   Accordingly, the KDC creditors and shareholders have not been harmed by the alleged Inappropriate Conduct of the Defendants.*

C.   *No evidence has been provided to date that establishes any damages attributable to the Defendants related to the allegations brought by the Plaintiff in this matter.   Further, Mr. Beaton's analysis does not provide a reasonable or reliable measure of damages and his analysis is inconsistent with the facts of this case.*

These opinions are based on the information available.   Should additional information become available, I reserve the right to amend these opinions.

**VII.    Documents Reviewed**

In preparing my analysis, I have reviewed documents produced in this matter. Exhibit 15 contains a list of these documents.

**VIII.    Compensation**

AlixPartners is being compensated at hourly billing rates that range from $120 to $525 per hour.

**IX.    Additional Analysis and Demonstrative Aids**

I reserve the right to amend and/or supplement this report based upon any new and/or additional facts or other documents which may come to my attention, or information, including expert reports, deposition testimony and related document exhibits thereto, which may be produced.

If I am called upon to testify, I may prepare demonstrative aids, such as graphs, charts or tables.

Louis G. Dudney, CPA

March 23, 2007



**Exhibit 1**
**KDC Foods, Inc.**
**Analysis of 2001 Budgeted Royalty Income v. Actual Royalty Income**



**Exhibit 2**
**KDC Foods, Inc.**
**2002 - 2003  - Projected Value v. Actual Results**



**Exhibit 3**
**Analysis of KDC Foods, Inc. Cumulative Annual Royalty Income & Net Income**
**2001 - Q3 2003**

**Confidential**                                                                                      **Attorney Eyes Only**



**Exhibit 4**
**KDC Foods, Inc.**
**Historical v. Projected Royalty Income (As of August 15, 2003)**

**Confidential**                                                                                              **Attorney Eyes Only**

**Exhibit 5**
**KDC Foods, Inc.**
**Historical v. Projected Net Income (As of August 15, 2003)**



**Exhibit 6**
**KDC Foods, Inc.**
**Analysis of 2003 Q4 Financial Performance - Projected v. Actual**





**Exhibit 7**
**Analysis of KDC Foods, Inc. Cumulative Annual Royalty Income & EBITDA**
**2001 - 2004**



**Exhibit 8**
**KDC Foods, Inc.**
**Current Ratio**
**December 2001 - January 2005**

**Confidential**                                                                                    **Attorney Eyes Only**



**Exhibit 9**
**KDC Foods, Inc.**
**Current Ratio - Excluding Citizens Bank Note as Current Liability**
**December 2001 - January 2005**

**Confidential**                                                                                    **Attorney Eyes Only**



**Exhibit 10**
**KDC Foods, Inc.**
**Analysis of Net Working Capital**
**December 2001 - January 2005**



**Exhibit 11**
**KDC Foods, Inc.**
**Analysis of Net Working Capital - Excluding Citizens Bank Note as Current Liability**
**December 2001 - January 2005**

**Exhibit 12**
**KDC Foods, Inc.**
**Analysis Debt Balances v. Cash Balances**
**December 2001 - January 2005**



**Confidential**                                                                        **Attorney Eyes Only**

**Exhibit 13**
**Analysis of KDC Total Capitalization[1] v. Cumulative Net Income**



[1] It appears that funds may have been invested in the LLC that were not booked as capital stock. These funds are not included in amounts shown above.

**Confidential**                                                    **Attorney Eyes Only**



# CURRICULUM VITAE
## OF
## LOUIS G. DUDNEY, CPA

| | |
|---|---|
| **POSITION** | Managing Director, Financial Advisory Services Practice, Co-Head of Case Management Services Practice, AlixPartners, LLP |
| **EDUCATION** | College of William and Mary, B.B.A. in Accounting |
| **PROFESSIONAL CERTIFICATIONS/ BUSINESS AFFILIATIONS** | Certified Public Accountant - Illinois<br>American Institute of Certified Public Accountants<br>Illinois Society of Certified Public Accountants<br>Member - Licensing Executives Society, American Bankruptcy Institute, Turnaround Management Association |
| **RANGE OF EXPERIENCE** | Mr. Dudney's experience covers broad types of transaction, litigation, valuation, bankruptcy and management consulting engagements, including mergers & acquisitions, solvency determinations, intellectual property valuation and dispute resolution, breach of contract and lost profits analysis, insurance dispute resolution, environmental claim analysis, and accounting malpractice and pronouncements misapplication.  Prior to joining AlixPartners, LLP, Mr. Dudney was a partner with PricewaterhouseCoopers in its Financial Advisory Services Group.  Mr. Dudney has consulted with companies in a number of industries including retail, professional services, real estate, financial services, healthcare, construction, entertainment, telecommunications, manufacturing, energy, and consumer products.  In performing engagements in these industries, Louis has analyzed economic, accounting and financial issues and testified in Federal Civil, Bankruptcy and State Courts as well as American Arbitration Association hearings and state regulatory proceedings as an expert witness. |
| **SELECTED ENGAGEMENTS** | • For a national food distributor, retained to evaluate and opine on damages related to the operation and delivery of food to a variety of quick serve and related restaurant operations.  Analyses of the financial and operating performance of individual stores, franchise groups, buying cooperatives and company owned stores for a variety of operations including Burger King, Sonic, Chili's, TGI Fridays, Sbarros and Applebees were performed. |



**LOUIS G. DUDNEY, CPA**
**Page 2**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- In a leveraged buyout transaction that resulted in litigation, analyzed the consideration and associated deal terms of the original transaction and developed a valuation of the subject company assuming the deal was unwound.

- Retained by a major ERP software manufacturer to analyze costs and damages claimed by a customer regarding a failed implementation claim. As part of this assignment, incremental costs, value offsets and damages were analyzed.

- In a copyright and trademark dispute, retained to evaluate the damages incurred, including dilution and diminution of value to the subject marks and names, related to a leading brand of sales training courses. As part of this assignment consumer confusion and pricing issues were analyzed.

- Retained by a prepared food business to analyze the accounting for its trade promotions and allowance program as part of a mergers and acquisition dispute with the business' prior owner.

- In an employee termination dispute, analyzed the profitability of a high tech maker of application specific integrated circuits to determine the appropriate payout to a former employee. As part of this analysis, the books and records of the company were analyzed to determine the profitability associated with selected products. Moreover, product line financial statements were constructed, cash flows were traced and historical payment activity was analyzed.

- In a theft of trade secrets case, retained by a mail order retailer to assist in analyzing both liability and damages resulting from the alleged theft of its mailing list. As part of this assignment, historical mailing lists, data extracts regarding mailing levels and success rates were utilized to analyze liability. In addition, an event study was performed to demonstrate the impact of the alleged misappropriation.

- For a specialty steel manufacturer, retained to calculate the economic loss from an interruption in business caused by an equipment failure. As part of this engagement, lost revenues were calculated as well as costs incurred or saved as a result of the equipment failure. The analysis performed resulted in a calculation of the profits lost due to the business interruption.



**LOUIS G. DUDNEY, CPA**
**Page 3**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- In a breach of contract matter, retained by a medical products distributor to analyze the damage claims made by a new business venture partner.  As part of this engagement, analyses of budgets, projections and forecasts were conducted.  In addition, incremental lost revenues and avoided costs were investigated.

- Retained by a property & casualty insurance company to opine on the appropriateness of claims submitted by the insured in an insurance coverage matter.  As part of this engagement, analyzed financial data submitted in support of the claim and determined the appropriate claim amounts.

- Retained by the owners of a cold storage warehouse to quantify the profits lost for a business interruption claim dispute with their insurers.  As part of this engagement, extensive analyses of operational statistics were prepared.  In addition, expenses associated with the business interruption were analyzed for inclusion in the claim.

- Retained by a property & casualty insurance company to review the claims experience and flow of funds (both indemnity and premium payments) associated with certain occurrence and claims made policies.  Constructed a financial model to estimate the value of selected claims applied to the appropriate underlying policies.

- Retained by an equipment manufacturer in an environmental clean-up cost action to assess future liabilities as a result of alleged PCB ground contamination from thousands of valves used along a large natural gas pipeline.  This required the use of a probabilistic decision tree model to project future expected liabilities.  This model incorporated expectations of future legislative changes, contamination levels and alternative remediation methods.

- Retained in a cost contribution action to determine the quantity of agricultural chemicals shipped to a pesticides processing facility, processed and shipped to retail resellers.  This engagement required review of over 20 years of historical volumetric data, production information and proposed allocations. Over $20 million in remediation costs were incurred in relation to this site.



**LOUIS G. DUDNEY, CPA**
**Page 4**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- Retained in a product liability suit in the candy industry to determine the lost profits that resulted from defective wrappers used in the production process.  This engagement included analyses of historical financial and operational performance measures to determine if any profits were lost.  In addition, analyses were conducted to determine the incremental financial impact to the manufacturer from the sale of the tainted products.

- In thirteen related dealership/franchise termination cases, retained by a Fortune 500 company to perform extensive analyses of each dealer/franchisee's performance, the performance of comparable dealers/franchisees, analyses of territory changes and ultimate determinations of damages incurred.  In addition, performed analyses of the financial condition of the dealer/franchisee, prior to the formation of the dealership/franchise, to determine suitability and identify incremental benefits compared to prior business performance.

- In a bankruptcy litigation matter retained by a food distribution company to analyze potential fraudulent conveyances related to several acquisitions that occurred prior to its Chapter 11 filing.  As part of this assignment, multiple valuations of the debtor were performed.  In addition, analyses of capital adequacy and reasonably equivalent value were also performed.

- In a venture capital transaction, determined the damages associated with fraudulent financial information provided prior to the sale of a software company.  This required analysis of corporate financial statements, independent accountants' workpapers and other financial disclosures.

- Retained by a major insurance broker to individually calculate, process, and pay rebates due to thousands of customers as a result of a $200 million dollar settlement with state officials.

- Retained by a large insurance company to evaluate brokerage and claim payments made as part of an employee health insurance plan reinsurance dispute.  This engagement included analyses of bordereaux, excess loss calculations, ceded premium and brokerage fees paid.



**LOUIS G. DUDNEY, CPA**
**Page 5**

**SELECTED
ENGAGEMENTS
(Continued)**

- Retained by an international insurance and financial services firm to coordinate the financial investigation of the former CEO and CFO related to over $100 million in loans taken from the company. This assignment included the analysis of personal financial information, bank statements, brokerage statements, investments and other transactional documentation. Additionally, assisted in the negotiation and execution of out-of-court settlement agreements to repay certain funds due.

- For a real estate limited partnership, retained to opine on a HUD audit of operations, cash flows and transactions related to inappropriate payments between identity-of-interest companies and the Management Agent. This analysis included reviews of compliance audits and analyses of transactions between several layers of limited partnerships.

- Retained by a health insurance company to evaluate the accounting treatment of various balance sheet and income statement accounts related to an earn-out provision of a merger & acquisition dispute. This assignment included determining the appropriate GAAP treatment for various transactions and recalculating EBITDA applicable to the earn-out.

- In a post acquisition purchase price and breach of contract dispute, valued the equity of an international health and fitness business.

- Retained in a large Chapter 11 filing to evaluate financing options and restructure over $50 million in lease financed assets. As part of this work, assisted the debtor source new financing options, negotiate restructured lease agreements and evaluate historical and future operating costs.

- For a value added reseller of advanced machining technology, retained to advise the company regarding valuation and deal structuring issues related to the potential sale of the company.

- For a regional bell operating company, retained to evaluate and opine on the valuation methodology used to negotiate a transaction to sell selected wireless communications technology with a lease back to the seller. This engagement included both an evaluation of the technology being sold as well as an analysis of the incremental value obtained by completing the transaction.



**LOUIS G. DUDNEY, CPA**
**Page 6**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- For the sale of a subsidiary related to interactive television, retained to value specific rights and property being conveyed from the seller to the purchaser. This valuation included reviews of the markets for interactive television, evaluation of relevant license agreements and development of financial models to determine the present value of selected technologies.

- Retained by a bond insurer to value a major telecommunications services provider in relation to a refinancing plan contemplated by the company.

- Retained by a manufacturer of digital television technology to value a portion of its technology portfolio. This engagement included the development of sophisticated real-options valuation analyses to account for the uncertainty of identified future decisions that would impact value. Discounted cash flow analyses and market comparable analyses were used as part of creating the valuation report.

- In a post acquisition purchase price dispute, retained by a safety products company to analyze the impact to EBITDA and the resulting purchase price paid of a variety of accounting restatements.

- Retained by a major candy manufacturer to evaluate a damage claim submitted by a supplier alleging lost profits caused by a breach of contract. This matter required an analysis of customer purchasing activity, production capacity, sales volumes and customer contracts.

- Retained by a foreign automobile manufacturer to determine the reasonable royalty related to an alleged infringement of a patent for the control of fuel consumption. This analysis included a review of comparable licenses, production alternatives, industry pricing history and allocation of profits between various automobile parts.

- Retained by a national distributor and rebuilder of machine tools to analyze its operations and financial status related to downturns in its performance. Additionally, assisted the company with analyzing its construction contracts, cost of completion accounting methodology, cost cutting efforts, renegotiating covenants related to its bank debt and performing due diligence related to a liquidity improving acquisition.



**LOUIS G. DUDNEY, CPA**
**Page 7**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- As part of a post acquisition purchase price dispute, retained by a Fortune 500 electrical equipment manufacturer to analyze a variety of accounting issues for both working capital adjustment and fraud claims. As part of this assignment, analyses of accounts receivable, accounts payable, inventory, revenue and EBITDA were performed.

- Retained by a large construction contractor to analyze a $4 billion construction damages claim alleged by the owners of 6 large nuclear power plants. As part of this assignment, reviewed project financing and cost documents, project operational data and consumer pricing to determine the value of the alleged claims.

- Retained by a bank group to analyze the operating and financial performance of a troubled steel company. As part of this engagement, assisted the bank group in evaluating and developing alternative restructuring plans including out-of-court v. Chapter 11 options, valuing the subject company, analyzing operating performance, monitoring liquidity and forecasting the company's ability to continue operations. Additionally, participated in negotiations regarding the future options for the business with various stakeholders including equity, employee unions, government oversight and various lender groups.

- Retained by a metal stamping, plastic blow molding and propane cylinder manufacturer to negotiate a restructuring of its balance sheet with its principal lenders. This engagement included providing valuations of the company based on various scenarios and deal structures. Conducted negotiations with its lenders.

- Retained in a bankruptcy matter of a retail conglomerate to value the entity, and evaluate the solvency and reasonably equivalent value of several transactions.

- Retained by a large electrical contractor to analyze its operations, review the status of its projects, cost overruns and claims. As part of this assignment, analyses of individual construction contracts were conducted to determine the financial status of claims, project profitability and future expected cash outflows.



**LOUIS G. DUDNEY, CPA**
**Page 8**

**SELECTED**
**ENGAGEMENTS**
**(Continued)**

- Retained by a bond insurer to develop alternative restructuring plans for a major utility.  This engagement included analyzing the company's ability to meet future debt obligations, comparing a planned equity rights offering to an outright sale of selected businesses, evaluating various Chapter 11 bankruptcy scenarios and valuing selected business units.

- For a caisson and foundation building company, retained by the bank group in a workout to analyze the status of various ongoing construction projects and document and trace the flow of funds for selected transactions between numerous operating entities.  This assignment included analyses of financial reporting, intercompany transactions, bank account activity, investment transactions and payments to third parties.

**Louis G. Dudney, CPA**
**Summary of Trial and Deposition Testimony in Last Four Years**

*In the Matter of the Investigation of Actions of Western Resources, Inc. to Separate Its Jurisdictional Electric Public Utility Business from Its Unregulated Businesses,* Kansas State Corporation Commission.

*John W. Evans, et al v. General Motors Corp.,* Superior Court, Judicial District of Waterbury at Waterbury.

*AFD Fund (as post-confirmation estate of AmeriServe Food Distribution, Inc. and its debtor affiliates.,) v. Lunan Corporation*., United States District Count, Northern District of Illinois, Eastern Division.

*Payless Cashways v. American Waterheater Company, et al.,* United States Bankruptcy Court for the Western District of Missouri.

*Erin Lewis, Independent Administrator of the Estate of Robert Anthony Russ v. The City of Chicago*, Circuit Court of Cook, Illinois County Department – Law Divison.

*Huthwaite, Inc. v. Sunrise Assisted Living, Inc.,* United States District Court for the Eastern District of Virginia, Alexandria Division.

*Conseco, Inc. and Carmel Fifth, LLC et al., v. Donald J. Trump, 767 Manager, LLC and Trump 767 Management, LLC.* American Arbitration Association.

*S.C. Johnson & Son, Inc., et al. v. Pliant Corporation,* United States District Court for the Eastern District of Michigan, Northern Division.

*Frank M. Leonesio, et al., v. Fitness Holdings Worldwide, Inc. et al.,* United States District Court for the District of Arizona.

*Ha-Lo Industries, Inc.,et al., v. John R. Kelley, Jr.*, United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

*Chicago Printing Company v. Heidelberg, USA.,* United States District Court for the Northern District of Illinois, Eastern Division.

*Puritan-Bennett Corp. and Mallinckrodt, Inc. v. Penox Technologies and Essex Industries, Inc.,* United States District Court for the Southern District of Indiana, Indianapolis Division.

*Argenta Finance, LTD. v. Bellsouth Enterprises, Inc.*, Commercial Arbitration

*Honeywell International, Inc., et al., v. Air Products and Chemicals.* In the Court of Chancery for the State of Delaware in and for New Castle County.

**Louis G. Dudney, CPA**
**Summary of Trial and Deposition Testimony in Last Four Years**

*Bentley Specialties, Inc. v. Score Acquisitions Corp., d/b/a Cody-Kramer Imports and F&F Foods, Inc.*  In the Circuit Court of Cook County, County Department, Law Division.

*Expeditors International of Washington, Inc., et al. v. Vastera, Inc. and Jennifer Sharkey.* United States District Court, Eastern District of Michigan.

*Richard Snyder, et al. v. Thomas and Betts Corporation,* United States District Court for the Northern District of Illinois, Eastern Division.

*Michael J. Lisle, et al. v. Health Communications Services, Inc., et al.*, In the Circuit Court of Cook County, Chancery Division.

*Aon Re, Inc. v. RGA Reinsurance Company,* United States District Court for the Northern District of Illinois, Eastern Division.

*Facility Capital Corporation, et al. v. Centerpoint Equipment Capital Corporation, et al.* American Arbitration Association.

*Maytag Corporation v. Whirlpool Corporation*, United States District Court for the Southern District of Iowa, Central Division.

*Nexans Wires S.A. and Lacroix & Kress Gmbh v. Sark-USA, Inc. and Sarkuysan Elektrolitik Bakir Sanayii Ve Ticaret A.S.,* United States District Court for the Southern District of New York.

*Statutory Committee of Unsecured Creditors on Behalf of Iridium Operating LLC, et al. v. Motorola, Inc.*, United States Bankruptcy Court, Southern District of New York.

*Larry F. Robb, Individually, in Behalf of a Class of Minority Shareholders of 3CI Complete Compliance Corp., and Derivatively in Behalf of 3CI Complete Compliance Corp., v. Stericycle, Inc., et al.* First Judicial District Court, Caddo Parish, Louisiana.

*Paul Oravec v. Sunny Isles Luxury Ventures L.C., et al.,* United States District Court, Southern District of Florida.

*Zimmer Technology, Inc. and Zimmer, Inc. v. Howmedica Osteonics Corp.,* United States District Court, Northern District of Indiana, South Bend Division.

*Robotic Workspace Technologies, Inc. v. ABB Inc. and ABB Automation Technologies AB,* United States District Court for the Middle District of Florida.

*S.C. Johnson & Son, Inc. v. Milton E. Morris, et al.,* State of Wisconsin, Circuit Court, Racine County.

**Louis G. Dudney, CPA**
**Summary of Trial and Deposition Testimony in Last Four Years**

*IMG Worldwide, Inc. v. Casey Close,* American Arbitration Association.

*Refco, Inc. et al.,* United States Bankruptcy Court, Southern District of New York.

*Cruz, et al. v. Wal-Mart,* California Superior Court.

SUMMARY OF PUBLICATIONS


"Has Our 500-year-old Accounting System Finally Met Its Match in the New Economy", The Journal of Corporate Renewal. Vol. 13/No. 5.  May 2000.

**Expert Report of Louis G. Dudney, CPA**
**Exhibit 15**
**Data Reviewed and/or Relied Upon**

- Amended Complaint
- Defendant First Products, Inc.'s and Donald Johnson's Answer to Amended Complaint and Affirmative Defenses
- Defendant Kim Myers' Answer to Amended Complaint and Affirmative Defenses
- Plaintiff's Rule 26(e) Supplement to its Rule 26(a)(1)(c) Disclosure
- Complaint in re: Appraisal Excellence, Ltd. v. KDC Foods, Inc., et al.
- Schedules of Assets and Liabilities in re: KDC Foods, Inc. filed with the United States Bankruptcy Court for the Western District of Wisconsin and Amendments
- Exhibits to the Declaration of Ryan S. Stippich in Support of Defendants First Products, Inc., Donald Johnson, Kim Myers, Jeffrey Covelli's Joint Motion for Summary Judgment (Volumes 1 and 2; Exhibits 1 – 23)
- Sale Approval Order in the matter of KDC Foods, Inc.
- Affidavit of Donald Johnson
- Affidavit of Harry Kraklow in Opposition to Plaintiff's Motion for Summary Judgment; Defendants Country Maid, Inc., Kenneth Banwart and Darin Massner's Proposed Findings of Fact; and First Products, Inc., Donald Johnson, Kim Myers and Jeffrey Covelli's Joint Motion for Summary Judgment
- Affidavits of Rick Wanke
- Affidavit of Stephanie L. Finn
- Affidavits of Stan Popko
- Deposition of Donald Johnson (Day 1)
- Deposition of Donald Johnson (January 11, 2007 (Day 2))
- Deposition of Darin Massner (December 12, 2006)
- Deposition of Stanley Popko (December 5, 2006)
- Deposition of Ronald Dervetski (December 6, 2006)
- Expert Report of Neil J. Beaton, CPA (February 23, 2007)
- Letter from Neil J. Beaton re: KDC Foods, Inc. – Supplement to Expert Report (March 1, 2007)
- Letter from Dennis M. Sullivan and enclosed materials provided by Neil Beaton (March 13, 2007)
- KDC Foods, Inc. financial data in Quickbooks electronic format
- Interview with Donald Johnson Jeff Covelli

| Prefix | Bates Range | | |
|---|---|---|---|
| Murphy Desmond | 000002 | - | 000023 |
| Murphy Desmond | 000237 | | |
| Murphy Desmond | 000242 | - | 000274 |
| | | | |
| RWAE | 0000477 | - | 0000479 |
| RWAE | 0001783 | - | 0001784 |
| RWAE | 0003365 | | |

**Expert Report of Louis G. Dudney, CPA**
**Exhibit 15**
**Data Reviewed and/or Relied Upon**

| Prefix | Bates Range | | |
|--------|-------------|---|------|
| RWAE | 0003765 | - | 0003782 |
| RWAE | 0004053 | - | 0004054 |
| RWAE | 0004221 | - | 0004240 |
| RWAE | 0004248 | - | 0004286 |
| RWAE | 0004533 | - | 0004591 |
| | | | |
| CM | 00879 | - | 00880 |
| | | | |
| FPI | 0000096 | - | 0000102 |
| FPI | 0000649 | - | 0000667 |
| FPI | 0001063 | - | 0001112 |
| FPI | 0001932 | - | 0001933 |
| FPI | 0002698 | | 0002703 |
| FPI | 0002705 | | |
| FPI | 0002763 | | |
| FPI | 0002816 | - | 0002817 |
| FPI | 0002819 | - | 0002835 |
| FPI | 0003016 | | |
| FPI | 0003496 | - | 0003564 |
| FPI | 0003966 | - | 0003971 |
| FPI | 005210 | - | 0005211 |
| FPI | 0005304 | | |
| FPI | 0005313 | - | 5314 |
| FPI | 0005356 | - | 0005368 |
| FPI | 05975 | - | 05976 |
| FPI | 0006400 | - | 0006430 |
| FPI | 0006433 | - | 0006526 |
| FPI | 0006529 | - | 0006582 |
| | | | |
| CD | 036 | | |
| | | | |
| VC | 010 | - | 011 |
| VC | 041 | - | 055 |
| VC | 058 | - | 074 |
| VC | 095 | - | 186 |
| | | | |
| | 633 | - | 636 |
| | 816 | - | 817 |
| | 850 | - | 851 |
| | 865 | - | 882 |
| | 987 | | |
| | 1002 | - | 1028 |
| | 1051 | - | 1054 |
| | 1081 | - | 1092 |
| | 1118 | - | 1132 |
| | 1341 | - | 1342 |
| | 1432 | - | 1439 |
| | 1455 | - | 1467 |

**Confidential**                    Page 2 of 3                    **Attorney Eyes Only**

**Expert Report of Louis G. Dudney, CPA**
**Exhibit 15**
**Data Reviewed and/or Relied Upon**

| Prefix | Bates Range | | |
|---|---|---|---|
| | 1646 | | |
| | 2296 | - | 2297 |
| | 2843 | | |
| | 2845 | | |
| | 2863 | | |
| | 2940 | - | 2952 |
| | 2984 | - | 3047 |
| | 03151 | - | 03153 |
| | 03215 | - | 03216 |
| | 03635 | - | 03641 |
| | 3679 | | |
| | 03706 | - | 03707 |
| | 03853 | | |
| | 03923 | - | 03925 |
| | 04038 | - | 04047 |
| | 04143 | - | 04159 |
| | 04161 | - | 04168 |
| | 04170 | - | 04213 |
| | 04298 | - | 04349 |
| | 04839 | - | 04841 |
| | 05020 | - | 05023 |
| | 05032 | - | 05035 |
| | 05039 | | |
| | 05755 | | |
| | 05765 | - | 05778 |
| | 06058 | - | 06062 |
| | 06282 | - | 06285 |
| | 06287 | - | 06289 |
| | 06291 | | |